Huertas Unemployment Compensation Case.

Argued March 19, 1970. Before WRIGHT, P. J., WAT-KINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and CERCONE, JJ.

*Darold L. Hemphill,* with him *Butterfield, Joachim, Brodt & Hemphill,* for appellant.

*Sydney Reuben,* Assistant Attorney General, with him *William C. Sennett,* Attorney General, for Unemployment Compensation Board of Review, appellee.

*Robertson B. Taylor,* with him *Robert H. Holland,* and *Kolb, Holland, Antonelli & Heffner,* for employer-intervenor.

OPINION PER CURIAM, June 11, 1970:
Decision affirmed.

DISSENTING OPINION BY CERCONE, J.:
On October 10, 1967, Luis G. Huertas, while in the employ of Bethlehem Steel Company, suffered injuries, including serious burns of second and third degree, which required extensive plastic surgery and several months of hospitalization. After a period of total disability, partial disability remained for which he receives Workmen's Compensation. Because of the seri-

ous burns to his feet, he was unable to do any extensive walking or be on his feet for any sustained length of time. In accordance with the recommendation of Bethlehem's Medical Department, he was given the position of power sweeper operator of a motor-driven broom type piece of equipment which cleaned cinders and debris off the driveway. He was given in-plant driving privileges which permitted him to ride and avoid the walk from Bethlehem's main gate to his place of work, a distance described as ranging from seven/tenths of a mile to a mile and a tenth.

Six examinations and tests given by Bethlehem Medical Department revealed that too much walking caused the skin on his right foot to become ulcerated and opened with increase of pain in the nerve endings of the area surrounding the second degree burns. As a result, his in-plant driving privileges were made permanent on October 10, 1967.

Huertas' driving license was suspended by the Commonwealth of Pennsylvania in December, 1967, and he requested Bethlehem to transfer his in-plant driving privilege to a friend who would provide him transportation, Huertas offering to supply whatever insurance Bethlehem desired. Bethlehem sent an ambulance to pick him up one day but refused his request for transfer of the in-plant driving privilege. Huertas did not come to work thereafter.

On March 8, 1968, Bethlehem advised Huertas by letter that his employment was terminated as of February 23, 1968. At the time Bethlehem wrote this letter, Huertas was in the hospital, still suffering from the serious residual effects of his injuries. He was hospitalized from March 7, 1968 through March 21, 1968. On March 20, 1968, Dr. Mirbach, Huertas' attending physician, certified on a form supplied by Bethlehem that "The patient has been continuously disabled (unable to work) from December 22, 1967 through

March 20, 1968" and that it was "indefinite" as to when the patient would be able to return to work. In the said report to Bethlehem, Dr. Mirbach advised "Patient complains that walking and activity incident to employment aggravated old leg injury" and described the condition he found "Lumbar ligament strain— Sciatic—Peroneal Nerve—Neuritis".

After ascertaining that Huertas was hospitalized when it sent its termination letter, Bethlehem rescinded the termination. On April 9, 1968, Mr. Kermit L. Schleifer, Supervisor of Bethlehem's Social Insurance and Compensation Department, contacted Huertas and told him he was scheduled to work (even though no release had been obtained nor had any examination been made by the Company's medical department, in accordance with its established practice). Mr. Schleifer testified that Huertas' response was merely a refusal to do anything and that he intended to sue his employer. Huertas testified he told Mr. Schleifer that he was physically unable to return to work, that he had no way of getting from the gate to the work area, and that neither of his doctors had released him even to the extent of permitting him to walk to the Company's Medical Department or Dispensary which first had to approve the return to work. Huertas testified that Schleifer knew that a transfer of the in-plant driving privilege had been refused. Huertas further testified that he talked to his Supervisor, Mr. Christine, on April 10, 1968, and that Mr. Christine refused over the phone to see him concerning his medical problems. Mr. Christine testified that he had no recollection of having heard from Huertas on April 10 or at any prior time.

On September 19, 1968, Huertas filed for unemployment compensation benefits which were denied, on October 8, 1968, by the Bureau of Employment Security which ruled that he had separated from his employ-

ment for reasons which were considered willful misconduct in connection with his work. After appeal by Huertas, the Referee, on November 22, 1968, modified the Bureau's original finding from willful misconduct to a voluntary abandonment or leaving of employment without necessitous and compelling reason. Upon further appeal, the Unemployment Compensation Board of Review ordered the Referee to hold further hearings in the matter. The testimony received during the further hearings was submitted to the Board which, on July 28, 1969, affirmed the Referee's holding that Huertas voluntarily abandoned or left his employment without necessitous and compelling reason.

The Board found: "Claimant testified his reason for not reporting for work was that he lost his Pennsylvania operator's permit and could not get to the plant, notwithstanding the fact he lived within two and one-half blocks from the main gate." The Board thus completely lost sight of the fact that the cause alleged by claimant was that he was physically unable to walk the distance from the plant gate to his place of work, which fact had already been acknowledged by Bethlehem by its grant to him of a permanent in-plant driving privilege on October 10, 1967, only two months before the suspension of claimant's operator's license. Not one iota of evidence was introduced which would support a finding that claimant's condition had changed from October 10, 1967 to April 10, 1968, so as to permit him to walk the distance from the gate to the place of work without causing further injury and pain. On the contrary, the record clearly proves claimant's continued disability with periods of hospitalization following the refusal of his request for the transfer of his in-plant driving privilege. In fact, he was in the hospital when Bethlehem first sought to terminate his employment. The Board relies on two medical reports, that of Dr. Reno and Dr. Heffernan, and con-

strues them far beyond the language contained therein and the circumstances surrounding them. The Board states "On April 5, 1968 claimant's physician, Dr. Reno certified that he was able and available for work with certain *restrictions* regarding his disabled feet." (Emphasis supplied) However, a reading of that April 5, 1968 report of Dr. Reno reveals that one of the "restrictions" referred to by the Board but ignored by it was the elimination of walking from the plant gate to place of work. Dr. Reno advised the Company as follows: "He (Huertas) also pointed out that it was necessary for him to walk for at least one mile from his entrance to the employers facilities to his place of activity. Additionally, he pointed out that he has been unable to obtain an auto license for himself because of a debt resulting from an accident dating back to 1953. This debt prevents him from using his own car and therefore he finds difficulty in transportation. . . . The patient has seven children. One can appreciate an anxiety psychoneurosis which has developed. One way in which the patient can be aided is in providing transportation from the gate of his place of employment to the actual place where he does his work. Additionally, he should not be in a high temperature environment, *nor should he be* walking or on his feet for any great length of time, by virtue of the expected sensitivity of the skin of the feet particularly on the right. (Emphasis added) If these facilities cannot be made for him, then this examiner would suggest that he be retired, so that he can seek employment elsewhere."

The Board also found: "Additionally, another physician who treated the claimant, Dr. Heffernan, also stated that he was able and available for the work offered to him by his employer." However, the letter of Dr. Heffernan, dated January 17, 1968, so relied upon by the Board, indicates no awareness of the refusal of Huertas' request of in-plant driving privileges. On the contrary,

his report is based on "how much consideration has been given to Mr. Huertas". Furthermore, his letter clearly shows Huertas' repeated attempts to secure medical attention from him for his condition.

The Unemployment Compensation Board of Review failed to perceive the true issue of fact: whether or not claimant was able to walk the distance from the plant gate to his place of work and failed to direct its attention to that issue. In doing so, as already shown, it also ignored the evidence in support of that main issue, and erroneously relied on two medical reports which in no way controverted the continued disability of claimant to walk the distance complained of. All the circumstances surrounding claimant's failure to work after his driving license was suspended clearly support the finding that his absence from work thereafter was not voluntary but due to his physical condition and that Bethlehem was well aware of that fact, contrary to the Board's finding that claimant "failed to contact the employer regarding his reason for refusing to report for work."

The action of the Board should be reversed because its findings are not supported by the evidence and further do not direct themselves to the true issue involved, which issue the credible and uncontradicted evidence answers in favor of the claimant.

HOFFMAN and SPAULDING, JJ., join in this dissent.